SEALED

FILED (DROP BOX)

SEP 25 2020

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. J. DOE,<br><br>Plaintiffs,<br><br>v.<br><br>REGENCE BLUESHIELD; CAMBIA HEALTH SOLUTIONS, INC.; REGENCE BLUECROSS BLUESHIELD OF UTAH; REGENCE BLUECROSS BLUESHIELD OF OREGON; REGENCE BLUESHIELD OF IDAHO; and REGENCE INSURANCE HOLDING CORPORATION,<br><br>Defendants. | Case No.<br><br>**20-CV-1433**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded**<br><br>**FILED UNDER SEAL** |

Relator, DOE, by and through their attorneys, alleges in this Complaint as follows:

### PRELIMINARY STATEMENT

1. This is a civil fraud action brought by Relator against defendants Cambia Health Solutions, Inc., Regence BlueShield, Regence BlueCross BlueShield of Utah, Regence BlueCross BlueShield of Oregon, Regence BlueShield of Idaho, and Regence Insurance Holding Corporation (collectively "Cambia") to recover treble damages sustained by, and civil penalties and restitution owed to, the Government as result of Cambia's violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* As set forth below, Cambia knowingly disregarded its duty to

Complaint - *1*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

ensure the accuracy of the risk adjustment diagnosis data that it submitted to the Centers for Medicare and Medicaid Services ("CMS") for thousands of Medicare beneficiaries covered by Medicare Part C plans operated by Cambia. By ignoring its duty to delete thousands of inaccurate diagnoses, Cambia unlawfully obtained and retained from CMS millions of dollars in payments under the risk adjustment payment system for Medicare Part C.

2. In addition, Cambia also used its Quality Incentive Program ("QIP") to induce providers to include thousands of Hierarchical Condition Category ("HCC") diagnoses for patients where there was little to no likelihood that the patient actually suffered from the corresponding medical condition. As a direct result of this scheme, Cambia was able to recover millions of dollars in increased premiums tied to these fraudulently included diagnoses.

3. Finally, Cambia disregarded conflicting provider information for HCCs. In circumstances where one provider invalidated a suspected HCC on a provider portal, but the same or another physician submitted a diagnosis related to that same, previously invalidated, HCC on a different claim, Cambia undertook no efforts to reconcile the conflicting information. Instead, Cambia submitted the claim diagnoses to the Government, and/or failed to delete those submitted diagnoses for the disputed HCC, because it knew that it would receive higher premiums as a result.

4. As a Medicare Advantage Organization ("MAO"), Cambia was responsible for covering the cost of services rendered by healthcare providers like hospitals and doctors' offices for the Medicare beneficiaries enrolled in Cambia's Part C plans. Cambia, in turn, received monthly capitated payments from CMS for providing such coverage. *See infra* ¶¶ 63-75.

5. Cambia knew that CMS calculated the payments to Cambia pursuant to a risk adjustment system, under which the amounts of those payments were based directly on the

Complaint - 2

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

number and the severity of the diagnosis data — in the form of ICD diagnosis codes — that Cambia submitted to CMS. *See* infra ¶¶ 76-80. In most cases, Cambia submitted the diagnosis codes reported by providers in the claims, and other data that the providers submitted to Cambia, to seek payments for treating Medicare beneficiaries enrolled in Cambia's Part C plans.

6. Cambia knew that, because the diagnosis codes it submitted to CMS affected payment directly, it had an obligation to ensure that its data submissions were accurate and truthful, including by complying with the ICD coding guidelines adopted by CMS regulations. *See* infra ¶¶ 87-93. Indeed, Cambia had a duty to research and correct any discrepancies in its risk adjustment data submissions and that it would comply with CMS's regulatory and contractual requirement that diagnosis codes for risk adjustment purposes must be substantiated by beneficiaries' medical records. *See* infra ¶¶ 81-86. In addition, Cambia was required to attest to CMS that its risk adjustment diagnosis data submissions were accurate, complete, and truthful according to its best knowledge, information and belief. *See infra* ¶¶ 124-31. As Cambia knew, the promises and attestations it made to CMS imposed on Cambia an ongoing obligation to make good faith efforts to delete inaccurate diagnosis codes. *See* infra ¶¶ 94-97.

7. Cambia's fraudulent practices began at least as early as 2017 (relating to 2016 date of service medical claims) and are continuing to date (the "relevant period"), in direct contravention of its promises and attestations to CMS.

8. As to the first category of fraudulent activity, Cambia implemented a "retrospective chart review" process using a vendor, Advantmed, pursuant to which medical records were obtained from providers concerning services provided to beneficiaries enrolled in Cambia's Part C plans. Advantmed then reviewed those medical records to identify all the diagnosis codes supported by the records. This process was "retrospective" because it typically

Complaint - 3

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

occurred in the year following the year when the services were provided to the member. The retrospective chart review was designed to verify whether diagnosis codes were accurate and supported by the medical records. Cambia was obligated to report accurate results of the chart review to Medicare – specifically to report all additional diagnosis codes to be added, as well as all diagnosis codes that should be deleted for lack of support in the medical records. To the extent the chart review located a net increase in supported diagnosis codes, Cambia expected to receive additional funds from Medicare.

9. Cambia knew that the results of the chart review could indicate whether or not the diagnosis codes Cambia previously submitted to CMS from related claims or supplemental files received from providers were accurate. Cambia also knew that, historically, the results of any "retrospective chart review" would result in eliminating a substantial portion (*e.g.*, 75-80% for date of service years 2015 and 2016) of diagnosis codes because they were not accurate or supported in the related medical records reviewed, and were thus so-called "orphan claim deletes." *See* infra ¶¶ 150-62. Cambia provided Advantmed with business logic to identify these related "orphan claim deletes," and Advantmed transmitted files with proposed claim diagnosis deletes to Cambia for submission to CMS.

10. When Cambia received the results of Advantmed's chart review, including claim delete files, for the 2018 service year, the amount of "orphan claim deletes" indicated by Advantmed's analysis was surprisingly low compared to what Cambia expected. Cambia analysts and its actuarial department had expected "orphan claim deletes" to eliminate approximately 75% of the value of the additional diagnoses found through the retrospective chart review, as had occurred in prior years. The "orphan claim deletes" indicated in the partial analysis first received from Advantmed were approximately $4 million (representing about 15% of the value of

Complaint - 4

additional diagnoses located through the retrospective chart campaign, which was $28 million). Advantmed subsequently updated the amount of orphan claim deletes to approximately $7.5 million (representing about 27% of the value of additional diagnoses).

11.   Internally, Cambia analysts and management knew that the information provided by Advantmed was inaccurate and orphan claim deletes were in excess of the $7.5 million amount. Cambia nevertheless submitted only part of the Advantmed delete results to CMS, choosing to report the first incomplete (and lowest) amount of approximately $4 million of deleted claims and $28 million of additional diagnoses, for a net request for an additional $24 million. Based on experience and correct methodology, the amount of deletes would have been approximately 75% of additional claims, or $21 million, resulting in a net claim to Medicare for $7 million ($28 million minus $21 million). Instead, Cambia requested and received approximately $24 million in additional payment from Medicare with respect to the 2018 service year, during 2019, which Cambia knew was an overpayment of approximately $17 million.

12.   Cambia understood that it had an obligation to validate the information received from Advantmed to ensure that the "orphan claim deletes" were properly submitted for the 2018 service year.

13.   Accordingly, from late 2019 through early 2020, Cambia analysts in its Risk Adjustment department, reviewed the information Advantmed had provided for "orphan claim deletes" from the 2018 service year. Cambia analysts concluded that Advantmed had not properly processed "orphan claim deletes." Several meetings were held to assess the scope of the resulting discrepancy between the Advantmed deletes and what correct deletes would involve, based on historical experience.

Complaint - 5

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

14.    When this information was discovered, despite an acknowledged obligation to submit deletions of those diagnoses that would result in repaying any overpayment from Medicare, within 60 days, Cambia employees, including upper level management, determined not to submit any additional deletes or to disclose to CMS the information about missed "orphan claim deletes" and the resulting overpayment from Medicare. This discrepancy amounted to approximately $17 million in unsubmitted deletes.

15.    Failure to report the "orphan claim deletes" was in direct contravention to Cambia's internal policies, including the Regence Medicare Risk and Revenue Policy and Procedure, which states clearly:

> Any overpayments received from CMS related to risk adjustment data will be reported and return to CMS within 60 days after the date on which the overpayment is identified. Regular reviews will be scheduled by Revenue Management staff to identify any potential overpayments related to risk adjustment data.

16.    This scheme to retain Medicare overpayments was apparently an effort by Cambia management to ensure preservation of lucrative bonuses they had received based on the false submission to Medicare which artificially inflated Cambia's income related to the 2018 service year. Cambia management understood that reporting the correct amount of "orphan claim deletes" to Medicare would result in an obligation to repay Medicare millions of dollars. *See infra* ¶¶ 147-48.

17.    Accordingly, for the 2018 service year, Cambia made revenue enhancement the primary purpose of its chart review program, while disregarding its obligation to find and delete inaccurate related claim diagnosis codes, because Cambia prioritized profits over compliance, and Cambia executives prioritized their bonus payments over obligations to Medicare. *See infra* ¶¶ 141-42, 147.

Complaint - 6

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

18. Ultimately, the additional profits that Cambia obtained through its chart review program came at the expense of the public fisc. By knowingly breaching its promises and attestations to CMS, and by knowingly disregarding its regulatory and contractual obligation to correct inaccuracies in its diagnosis data submissions, Cambia improperly obtained or retained millions of dollars from CMS in violation of three FCA provisions — 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G). *See* infra ¶¶ 51-56.

19. The second scheme orchestrated by Cambia involves recent modifications to the Quality Incentive Program ("QIP") Cambia has offered to its provider network since 2014. The program provides medical providers incentives if the medical providers successfully "close" HCCs suspected by a vendor, Pulse8, retained by Cambia to identify likely conditions of its members, by either submitting a claim with a related diagnosis or a supplemental file with such a diagnosis. The incentives ranged from $20 per member attributed to a provider for a 70% closure rate to $175 for a 100% closure rate in 2019.

20. QIP was implemented by Cambia's Risk Adjustment department, which in 2014 was led by Shawn Alexander (former Vice President Risk Adjustment and Stars), and Tyler Reid (former Director Risk Adjustment Operations). The program provided information about suspected HCCs to Cambia's participating medical providers, first by sending PDFs and Excel spreadsheets with this information to providers in 2015. After 2015, Cambia established a web portal, the Care Gap Management Application ("CGMA") which providers could use to login and view open, suspected member HCCs and the provider's QIP HCC closure performance information.

21. At the outset of the QIP program, Cambia represented to medical service providers that the program was designed to provide accurate information to fill in gaps in HCC diagnoses

Complaint - 7

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

and monitor patient screening for Stars measures. As part of the CGMA portal rollout, Cambia provided training on the program to its provider network and also engaged with medical service providers to improve the accuracy of identification of potential HCCs.

22.    By logging into the portal, medical providers can view potential, suspected HCC diagnoses for their patients and indicate whether they agree that the patient should be diagnosed with the listed HCC, and, when indicating a member had a given condition, upload a medical record supporting that the provider actually saw the patient in the service year and that the member had the suspected condition.

23.    The portal is populated, in relevant part, with potential HCCs provided to Cambia by Pulse8. Pulse8 identifies potential HCCs for Cambia's Medicare Advantage members based on a review of medical, pharmacy and other claims, as well as prescriptions, and historical CMS submission file results. When Pulse8 transmits the suspected HCCs to Cambia, Pulse8 reports a "confidence level" associated with each HCC, which ranges from Very Low (1), Low (2), Medium (3), High (4), to Very High (5), indicating the confidence that Pulse8 has that the member has that HCC. For persisting conditions, Pulse8 may report the last known diagnosis supporting that HCC.

24.    Pulse8 transmitted these "suspecting files" to Cambia, including the associated confidence levels, and those files were loaded into a database called CARETS ("Care Reminder Tracking System"). From there, CARETS transmitted open, suspected HCCs to the Care Gap Management portal ("CGMA"), where the associated confidence level was High (4) or Very High (5). From 2014 to 2018, medical providers never saw any of the HCCs which Pulse8 reported with Very Low (1), Low (2), or Medium (3) confidence levels.

Complaint - 8

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

25.    The philosophy regarding transmitting suspected HCCs for the annual QIP campaign as established by Alexander and Reid was that Cambia should be conservative in presenting suspected HCCs to medical providers. This conservative approach was supported by the absence of perceived value in presenting an unlikely condition to medical providers for confirmation. Indeed, presenting inaccurate suspected diagnoses would likely lead providers to not participate in the QIP program or to incorrectly diagnose a member with a condition they did not have. Accordingly, for the first five years of the QIP program, from 2014 to 2018, Cambia only presented providers with potential HCC codes that Pulse8 concluded were at a confidence level of High (4) or Very High (5).

26.    Therefore, for years, the suspected HCCs, on spreadsheets transmitted by email and then presented on the CGMA web portal that medical providers would review, were only populated with HCC codes that Pulse8 suspected at a confidence level of High (4) or Very High (5). Accordingly, Cambia's medical providers grew to trust that the HCC suspecting was reasonable and worth considering for their patients.

27.    Around December 2018 or January 2019, Cheryl Babo, the new Director responsible for Risk Adjustment, instructed an analyst to intercept the data file received from Pulse8 and change the data to alter the confidence levels associated with suspected HCCs that were reported as Very Low (1), Low (2), and Medium (3) to a level at which they would be uploaded into CGMA (e.g., to High (4) or Very High (5)).

28.    Sometime before February 2019, the analyst implemented Babo's instructions by altering all the confidence levels that were actually reported as Very Low (1), Low (2), and Medium (3) so that the Pulse8 data appeared to reflect all of those suggested HCC codes received a confidence level of High (4) from Pulse8.

Complaint - 9

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

29.     This false suspecting information in CARETS, in turn, resulted in the system depicting to providers all identified possible HCCs without regard to the likelihood that the member actually had the condition. As a result, instead of reviewing only the HCCs that were highly or very highly likely to be accurate, as they had in the past, providers were provided information about conditions that Cambia knew were highly unlikely.

30.     Cambia never informed its provider network of the changes it had made. The result was that many medical providers accepted the highly unlikely conditions, based on their historical experience with the quality of the potential diagnoses that Cambia had provided for year.

31.     The medical service providers received an incentive of between $20 and $175 per member depending on the rate of suspected HCCs they closed, from 70% to 100% of the suggested HCCs, and consistent with past practice, providers accepted many of the suggested diagnoses.

32.     Cambia was, or should have been, aware that the acceptance of very unlikely HCCs by its medical providers was highly inaccurate and improper. As a result, thousands of improper HCC diagnoses were likely accepted for the 2019 service year, resulting in millions of dollars of additional payments from Medicare.

33.     Cambia was not entitled to this additional payment from Medicare and would not have received it had it not deliberately altered the Pulse8 data. As an MAO, Cambia is obligated to verify the accuracy of information submitted to Medicare. Instead, Cambia developed a scheme to alter data in order to encourage the submission of false diagnoses related to unlikely HCCs to Medicare.

Complaint - 10

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

34.     During 2020, Cambia has continued to alter data received from Pulse8 to provide highly unlikely suspected HCCs to medical service providers in order to continue to improperly receive additional funds from Medicare.  Analysts continue to intercept and modify the Pulse8 suspecting data before the information is loaded into the CARETS database.  Cambia providers have still not been informed of the change in how suspecting information is presented.

35.     The third area in which Cambia fails to honor its obligations to provide accurate information to Medicare is when Cambia is confronted with conflicting provider information about whether a member has diagnoses related to an HCC.

36.     Every year, from 2016 to the present, medical providers have invalidated thousands of suspected member HCCs on the CGMA portal.  For several thousand of these member condition invalidations, the same or another medical provider has subsequently reported a diagnosis related to the invalidated HCC on a claim.

37.     Cambia has accepted the conflicting diagnosis without question or review, despite the provider invalidation indicating a potential misdiagnosis.

38.     Cambia intentionally failed to have its Quality Assurance coding team review these questionable diagnoses.

39.     On information and belief, Cambia's failure to address this quality issue is because the only outcome would be that Cambia would receive less money from Medicare.  Despite obligations to ensure the accuracy of HCC risk adjustment information that Cambia submits to Medicare, Cambia has refused to address this issue, potentially receiving additional millions from Medicare as a result.

Complaint - *11*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

**THE PARTIES**

40.    Plaintiff relator DOE (a pseudonym), is an employee of Cambia Health Solutions, Inc., who has personal and direct knowledge of the facts set forth herein, as well as an understanding of the risk adjustment payment system for Medicare Part C plans. The information provided by Relator has not been publicly disclosed, but in any event, Relator qualifies as an original source. Relator has complied with all obligations of the False Claims Act, including voluntary disclosure of the information set forth herein before filing of this Complaint.

41.    Defendant Cambia Health Solutions, Inc. (formerly known as The Regence Group), is an Oregon corporation with its headquarters at 100 SW Market St., Portland, Oregon, 97201, which provides health insurance to its 2.4 million members in the Pacific Northwest, including approximately 125,000 Medicare members in conjunction with its Regence-branded affiliates. During the times relevant to this action, Cambia maintained four Medicare Part C plans throughout the Western United States, in Washington, Oregon, Utah, and Idaho.

42.    Defendant Regence BlueShield is a Washington corporation, with a mailing address of 1800 Ninth Avenue, Seattle, Washington 98101.

43.    Defendant Regence BlueCross BlueShield of Utah is a Utah corporation, with a mailing address of 15 West South Temple, Suite 600, Salt Lake City, Utah 84101, and does business as Regence BlueCross BlueShield of Utah.

44.    Defendant Regence BlueCross BlueShield of Oregon is an Oregon corporation with a mailing address of P.O. Box 1271, Portland, Oregon 97207.

45.    Defendant Regence BlueShield of Idaho is an Idaho corporation, with an Idaho Registered Agent at Corporation Service Company, 12550 W. Explorer Drive, Suite 100, Boise, Idaho 83713.

Complaint - *12*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

46.     Defendant Regence Insurance Holding Corporation is an Oregon corporation with a mailing address of 100 Southwest Market Street, Portland, Oregon 97201, and on information and belief, is the holding company for Cambia's Regence operations.

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over the claims under the FCA pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345.

48.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Cambia transacted business in this District and because a substantial part of the events giving rise to the claims herein occurred within this District.  For example, Cambia operated a Medicare Part C plan, Regents BlueShield of Washington, that enrolled numerous patients who reside in this District. *See* supra ¶ 11.

49.     This Court may exercise personal jurisdiction over Cambia pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process.

## THE FALSE CLAIMS ACT

50.     The False Claims Act was originally enacted in 1863 to address fraud on the Government in the midst of the Civil War, and it reflects Congress's objective to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." *See* S. Rep. No. 99-345, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 5266.

51.     As relevant here, the FCA establishes treble damages liability to the Government where an individual or entity:

i.      "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[;]"

ii.     "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[;]" or

Complaint - *13*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

    iii.    "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]"

31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).

52.    "Knowingly," within the meaning of the FCA, is defined to include a defendant acting in reckless disregard or deliberate indifference of the truth or falsity of information, as well as actual knowledge of such falsity by the defendant. *See id.* § 3729(b)(1). Further, "no proof of specific intent to defraud" is required to establish liability under the FCA. *Id.*

53.    For purposes of section 3729(a)(1)(B), the FCA defines "material" as "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

54.    The FCA also defines "obligation" in section 3729(a)(1)(G) – the reverse false claims provision – to include any "established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of an overpayment." *Id.* § 3729(b)(3). This broad definition reflects Congress's intent for the reverse false claims provision to apply to non-fixed duties to pay or repay the Government. *See* S. Rep. 111-10 at 14 (2009). In 2010, Congress further reinforced the duty on Medicare program participants like MAOs to return overpayments in a timely manner. Specifically, as part of the Patient Protection and Affordable Care Act of 2010, *see* 124 Stat. 119, 753-56 (2010), Congress added a provision to the Social Security Act that obligates MAOs like Cambia to report and return overpayments made by Medicare within sixty days of the identification of the overpayments. *See* 42 U.S.C. § 1320a–7k(d)(2). Under this provision, if a MAO makes a late report or repayment—that is a report or repayment after 60 days—it is still liable to pay treble damages and penalties under the FCA.

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

55.    Finally, in addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.[1] *See* 31 U.S.C. § 3729(a)(1).

56.    Relator meets all the necessary statutory criteria to bring a case under the False Claims Act. Relator has made the necessary disclosures to the Attorney General regarding Cambia's fraudulent scheme. The information regarding that scheme is not public information, and, to the extent any of that information is public, Relator constitutes an original source of that information under the FCA.

## THE MEDICARE ADVANTAGE PROGRAM AND ITS RISK ADJUSTMENT PAYMENT SYSTEM

### A.    Medicare Advantage and the Role of Part C MAOs

57.    Medicare is a federally-operated health insurance program administered by CMS benefiting individuals 65 and older and the disabled. *See* 42 U.S.C. § 1395c et seq.

58.    Parts A and B of the Medicare Program are commonly known as "traditional" Medicare. Part A covers inpatient and institutional care, while Part B covers physician, hospital, outpatient, and ancillary services and durable medical equipment. Under Medicare Parts A and B, CMS reimburses healthcare providers (*e.g.*, hospitals and physicians' offices) directly using a fee-for-service system. Specifically, healthcare providers submit claims to CMS for medical services actually rendered. CMS, in turn, pays the providers directly for each service based on payment rates established by the Government.

59.    On the other hand, Medicare Part C, which is at issue in this case, involves Medicare beneficiaries who have elected to receive Part A and Part B benefits through a Medicare Advantage plan ("Part C plan" or "MA plan"). *See* 42 U.S.C. §§ 1395w-21 to 1395w28. The

---

[1] The range of civil penalties for FCA violations occurring after November 1, 2015, is $10,781 to $21,563, see 82 Fed. Reg. 9,131-9,136 (2017).

Complaint - *15*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

MA plans, in turn, are operated and managed by MAOs, which are private insurers like Cambia. *See* 42 C.F.R. §§ 422.2, 422.503(b)(2).

60.    Under Medicare Part C, beneficiaries receive healthcare services managed by those plans. More specifically, when a healthcare provider furnishes medical services to a Medicare beneficiary enrolled in an MA plan, the provider submits claims and data regarding services provided to the MAO that operates the MA plan in order to receive payment from the MAO, instead of CMS.

61.    Congress expressly delegated authority to CMS to issue rules to implement and regulate Medicare Part C. *See* 42 U.S.C. § 1395w-26(b). Pursuant to that delegation, CMS has promulgated regulations that, inter alia, define the MAOs' obligations and responsibilities. *See* generally 42 C.F.R. Part 422. As discussed more fully below, *see* infra ¶¶ 124-31, CMS's Part C regulations require MAOs like Cambia to implement compliance procedures and programs and to make annual attestations.

62.    In addition to issuing regulations, CMS also has defined the MAOs' obligations contractually. For example, in order to participate in Medicare Part C, MAOs must execute a written agreement or a renewal of the written agreement with CMS on an annual basis for each of the Part C plans they operate. On information and belief, Cambia executed such agreements or renewals annually for all of the Part C plans it operated from 2015 to present.

**B.    Medicare Part C's Risk Adjustment Payment System and the Role of ICD and HCC Codes in CMS's Calculation of Risk Adjustment Payments**

63.    A central and distinguishing feature of Medicare Part C is how CMS determines the amount of the payments to which each MAO is entitled for providing healthcare coverage to a beneficiary enrolled in one of the MAO's Part C plans. Instead of compensating an MAO on a fee-for-service basis for specific medical services for a beneficiary, CMS makes monthly

Complaint - *16*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

payments to the MAO in a fixed, capitated (per beneficiary enrollee in each Part C plan) amount for providing coverage for each of the Medicare beneficiaries enrolled with the Part C plan.

64.     Unlike under Parts A and B, the per-member, per-month payments that CMS makes to MAOs under Medicare Part C do not depend on the amount of services provided to a specific beneficiary.  Instead, the capitated rate is determined based on how the bid submitted by an MAO compares to an administratively set benchmark established under the Part C statute. *See* 42 U.S.C. § 1395w-23(a)(1)(B); 42 C.F.R. §§ 422.254, 425.304.

65.     Within this system, which Congress has mandated since 2000, *see* 42 U.S.C. § 1395w-23(a)(1)(C) (directing CMS to adjust the capitated payments for each MA plan enrollee based on each enrollee's demographic factors and health status), CMS uses its risk adjustment payment system to determine the capitated payments based on the expected risk of each beneficiary.[2]

66.     More specifically, CMS calculates, for each beneficiary enrolled in a Part C plan, a risk score – also known as the risk adjustment factor, or "RAF" – which acts as a multiplier for purposes of determining the capitated payment for that enrollee. *See* 42 C.F.R. § 422.308(e).[3] In other words, CMS pays MAOs more for beneficiaries with certain serious illnesses or chronic

---

[2] Because CMS calculates and makes the monthly capitated payments to MAOs in a given payment year before CMS necessarily has received all the diagnosis data relevant to the risk-adjustment calculation, CMS also engages in a "reconciliation process" *after* the conclusion of each payment year. *See* 42 C.F.R. § 422.310(g)(2).

Through this process, CMS may conclude that "adjustments to payments are necessary" based on subsequently-submitted diagnosis data, which may result in CMS making an additional reconciliation payment to an MAO or seeking a reconciliation refund from the MAO. *See id.*

[3] To determine the base monthly payment amount for Medicare beneficiaries enrolled in a specific Part C plan, CMS uses a bidding process in which each Part C Plan, through its MAO, submits a bid amount.  That bid is then compared to an administratively set benchmark set by CMS. *See* 42 C.F.R. Part 422, subparts F and G.

Complaint - 17

medical conditions and, thus, higher risk scores, than for beneficiaries without those conditions and, thus, lower risk scores

67.     Since 2004, CMS has employed a hierarchical condition category ("HCC") model to calculate the risk score for Medicare beneficiaries enrolled in Part C plans. As directed by Congress, the HCC model takes into account both the demographic factors and health status of Medicare beneficiaries. *See* 42 C.F.R. § 422.2.

68.     Clinically, HCCs are categories of related medical diagnoses including major, *e.g.*, severe, and/or chronic illnesses. *See id.* Between 2004 and 2013, there were 70 HCCs in CMS's Part C risk adjustment model. Starting in 2014, and after CMS revised its model, the number of HCCs increased to 79. As of 2019, the CMS table listed 89 separate HCCs.

69.     Each HCC correlates with the marginal predicted cost of medical expenditures for that set of medical conditions based on CMS's data from administering the traditional Medicare Fee-For-Service program. Some examples of HCC codes are HIV/AIDS (HCC 1), metastatic cancer and acute leukemia (HCC 8), congestive heart failure (HCC 85), and ischemic stroke (HCC 100).[4]   Higher relative values (also sometimes referred to as relative factors, or coefficients) are assigned to HCCs that include diagnoses with greater disease severity and treatment costs.

70.     A single Medicare beneficiary may have none, one, or multiple HCCs, which affect the risk adjustment payment calculated by CMS according to the relative values of those HCCs and the base payment amount for a specific Medicare beneficiary.

---

[4] HCC numerical codes changed between the 2004–2013 model (known as Version 12) and the 2014 model (known as Version 22). The numerical examples of HCC codes cited herein are from the Version 22 model.

Complaint - *18*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

71.    To illustrate, assume that adding HCC 8 (metastatic cancer and acute leukemia) to a hypothetical Medicare beneficiary's list of HCCs in 2018 would have increased that beneficiary's overall risk score from 0.7 to 2.87, *i.e.*, by 2.17; and further assume that the base payment amount for this beneficiary was $10,000. In these circumstances, adding HCC 8 would have caused CMS to pay out $21,700 more in risk adjustment payments for that beneficiary in 2018.

72.    To determine which HCCs are applicable to each Medicare beneficiary, CMS's HCC model relies on the diagnoses – more specifically ICD diagnosis codes – documented by medical encounters that Medicare beneficiaries have with authorized healthcare providers (*e.g.*, a visit to a doctor's office or an inpatient stay at a hospital). In other words, the ICD diagnosis codes submitted by MAOs are used by CMS to calculate the risk adjustment payment.

73.    HHS has adopted the ICD Guidelines for Coding and Reporting as the standard for medical record documentation. *See* 45 C.F.R. § 162.1002(c)(2) and (c)(3) ("The Secretary [of HHS] adopts ... the official ICD-10-CM Guidelines for Coding and Reporting ...."). CMS regulations, therefore, required MAOs to "submit data that conform to" the ICD coding guidelines. *See* 42 C.F.R. § 422.310(d)(1) (requiring MAOs to submit data in conformity with "all relevant national standards").

74.    Practically, the ICD coding and classification system allows healthcare providers, insurance carriers and public health agencies to use alphanumeric codes to represent diagnoses. Each disease, injury, infection and symptom has its own ICD code. During the relevant times, the applicable standards for ICD coding have been set forth in two systems — first, up to October 1, 2015, the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-

Complaint - *19*

9"); and thereafter, the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10").

75.    Finally, the HCC model is prospective, meaning that it relies on risk-adjusting diagnosis codes from dates of service by a provider in one year (the "date of service year") to determine payments in the following year (the "payment year"). In other words, CMS calculates the risk score for each Medicare beneficiary enrolled in Part C anew for each payment year based on the ICD codes from medical encounters that occurred in the immediately preceding year. As illustrated by the hypothetical example in paragraph 70 above, the higher a Part C beneficiary's risk score, the higher the payments by CMS to the MAO operating that beneficiary's Part C plan.

C.    **CMS's Risk Adjustment Payment Process and Its RAPS and EDPS Risk Adjustment Data Reporting Systems**

76.    In most cases, the ICD diagnosis codes reported to CMS for risk adjustment purposes originate from healthcare providers who treat Part C beneficiaries. In this scenario, the risk adjustment data is typically generated and reported in five steps.

77.    First, based on a face-to-face encounter between a healthcare provider and a Part C beneficiary, the provider (the physician or a nurse) would document the encounter in the beneficiary's medical records, including the characteristics of the beneficiary's illnesses or medical conditions. Next, the provider – or, often, a coder working for the provider – would assign the diagnosis codes reflecting the beneficiary's illnesses or medical conditions in the provider's records for the beneficiary. Third, MAOs like Cambia would receive diagnosis codes from the provider. Healthcare providers can transmit diagnosis codes to an MAO when they submit claims for payment from the MAO for treating the beneficiary, in encounter records reporting the services rendered, or by alternative means (for purposes of this Complaint, diagnosis codes reported by providers to MAOs like Cambia are referred to as "provider reported codes").

Complaint - 20

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

Fourth, the MAO would in turn submit those diagnosis codes to CMS using the risk adjustment data reporting systems provided by CMS. Finally, CMS maps each beneficiary's diagnosis codes to HCCs and then calculates each beneficiary's risk score to apply to the payment calculation.

78.    During the Relevant Period, CMS utilized two electronic systems for collecting risk adjustment diagnosis data — the Risk Adjustment Processing System ("RAPS") and the Encounter Data Processing System ("EDPS"). Since 2015, CMS has calculated risk adjustment payments using a combination of RAPS and EDPS-submitted diagnosis data. The RAPS data submissions (and, after 2015, the EDPS data submissions) were claims for payment from CMS because the reported diagnosis codes factored directly into CMS's risk adjustment calculations.

79.    More specifically, the data that MAOs submit through the RAPS system has several components. For example, the component known as AAA identifies the submitter, while the component known as BBB identifies the MAO. As relevant here, the CCC component contains the Medicare identification number for a particular beneficiary as well as up to ten diagnostic clusters for that beneficiary. Each cluster, in turn, contains the date on which the medical treatment occurred, the type of provider, a diagnosis code from the medical encounter, and a "Delete Indicator."[5] Because each diagnostic cluster includes a distinct diagnosis that can increase a beneficiary's risk score, each cluster is, for purposes of the FCA, a separate claim for payment.[6]

---

[5] As discussed more fully below, this indicator allows MAOs to correct or withdraw a false cluster by advising CMS to delete the inaccurate diagnosis code in that cluster.

[6] In the EDPS system, MAOs similarly submit data with a number of components, known as "loops." ICD diagnosis codes are among the data that MAOs are required to submit to CMS using EDPS. Further, like the RAPS system, the EDPS system has mechanisms designed for MAOs to notify CMS to delete certain diagnosis codes so that CMS would not use those codes for purposes of calculating risk-adjustment payments.

Complaint - *21*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

80.     During the relevant period, CMS calculated the risk adjustment payments to be made to MAOs in three phases.  First, CMS made an initial calculation based on the diagnosis data reported by MAOs for the 12-month period ending in the June before a given payment year (*e.g.*, diagnosis data from July 2016 through June 2017 for payment year 2018).  *See* 42 C.F.R. § 422.310(g) (requiring MAOs to submit such diagnosis data by September).  This initial calculation determined the interim monthly payments that CMS made to MAOs in the first six months of the payment year.  Next, CMS recalculated the risk scores for beneficiaries enrolled in an MAO's plans based on diagnosis data for medical encounters during the year immediately preceding the payment year (e.g., diagnosis data from January through December 2018 for payment in 2019).  Based on that recalculation, CMS would make retroactive adjustments to payments made in the first half of the payment year and also update the interim payments for the second half of the payment year.  Finally, after the payment year ended, CMS provided a further opportunity for MAOs like Cambia to submit or correct the diagnosis data. Based on the additional submissions or corrections, CMS recalculated the risk scores again "to determine if adjustments to payments are necessary."  42 C.F.R. § 422.310(g)(2).  If such adjustments were necessary, CMS would make the adjustments as part of the annual reconciliation process to ensure that the final payments to the MAOs were accurate.  This might involve CMS making an additional payment to a MAO if the MAO submitted additional diagnosis data by the final submission deadline or involve CMS seeking a recoupment from the MAO if the MAO deleted inaccurate diagnosis codes.

**D.     CMS Required MAOs to Follow the "Medical Record Documentation" Standard for Part C Risk Adjustment Diagnosis Data Submissions**

81.     Because the accuracy and integrity of CMS's calculation of Part C risk adjustment payments depend on the accuracy of the diagnosis codes MAOs submit to CMS, CMS

Complaint - 22

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

promulgated regulations regarding the coding and medical record documentation standards for risk adjustment diagnosis data. More specifically, as noted above, CMS required MAOs to "submit [diagnosis] data that conform to" the ICD coding guidelines. *See* 42 C.F.R. § 422.310(d)(1) (requiring MAOs to submit data in conformity with "all relevant national standards," which, pursuant to 42 C.F.R. § 162.1002(c), included the ICD coding guidelines); *accord* Medicare Managed Care Manual ("MMC Manual"), Chap. 7, Ex. 30 (Aug. 2004) (instructing MAOs to follow the ICD coding guidelines in submitting diagnosis codes).[7]

82.    As relevant here, the ICD coding guidelines consistently provided that "accurate coding cannot be achieved" in the absence of "complete documentation in the medical record." *See, e.g.*, ICD-10-CM Official Guidelines for Coding and Reporting FY 2014 at 1. This coding standard is widely understood by MAOs like Cambia, and they commonly refer to it as the risk adjustment "medical record documentation" requirement. Under this standard, a diagnosis code can be considered accurate and valid for risk adjustment purposes if it is documented in and supported by medical records for a particular encounter between a patient and a healthcare provider. *See id.* at 113 ("For accurate reporting of ICD-10[] diagnosis codes, the documentation should describe the patient's condition, using terminology which includes specific diagnoses, as well as symptoms, problems, or reasons for the encounter").

83.    In addition, the ICD coding guidelines also specified that a diagnosis code should not be applied if a condition is documented in the medical records as only "probable," "suspected," "questionable," on that the provider is trying to "rule out," or characterized by "other similar terms indicating uncertainty." *See id.* at 114.

---

[7] As noted below in paragraph 100, the annual contracts that Cambia signed with CMS each expressly required compliance with the MMC Manual. *See, e.g.*, Anthem Part C Annual Agreements at Art. II.A (requiring Cambia to comply with CMS policies, including, specifically, the MMC).

Complaint - 23

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

84.    CMS has repeatedly provided training and instructions to MAOs on how to implement the medical record documentation requirement under the ICD coding guidelines. For example, CMS issued public guidance to emphasize to MAOs that they were responsible for submitting "risk adjustment data that are substantiated by the physician or provider's full medical record," *see* MMC Manual Chap. 7, § 111.8 (Aug. 2004), and to ensure that "[a]ll diagnosis codes submitted [are] documented in the medical record," *see* MMC Manual Chap. 7, § 40 (June 2013). Likewise, provisions in the MMC Manual advised MAOs that they should not submit diagnosis codes for risk adjustment purposes in the condition at issue was only probable, suspected, or questionable. *See* MMC Manual Chap. 7, Ex. 30 (Aug. 2004).

85.    In addition, CMS offered trainings to MAOs on how to implement this regulatory requirement starting as early as 2003. *See* 2003 Regional Risk Adjustment Training for MAOs Participant Guide § 4.1 (MAOs "must submit risk adjustment data that are substantiated by the patient's medical record"). To emphasize the importance of this requirement, and to ensure that MAOs understood it, CMS continued to provide training on this regulatory requirement in 2004, 2005, 2006, 2007, 2008, 2012, 2013, and 2014. *See* 2004 Regional Risk Adjustment Training for MAOs Participant Guide, §§ 5.1, 5.5, 6.1.3; 2005 Risk Adjustment Data Basic Training Participant Guide §§ 4.1, 5, 5.1, 5.5, 8.7.3, 9.1, 9.2; 2006 Risk Adjustment Data Basic Training for MAOs Participant Guide §§ 5.1, 5.4, 5.5, 7.7.3, 8.1, 8.2; 2007 Risk Adjustment Data Training for MAOs Participant Guide §§ 6.1, 6.4, 7.1, 7.2, 8.7.3; 2008 Risk Adjustment Technical Assistance Participant Guide §§ 5.6, 6, 6.1, 6.4, 6.5, 7.1, 7.2; 2012 Regional Technical Assistance Participant Guide § 2.2; Risk Adjustment 101 Participant Guide §§ 3.2.4; 4.3 (2013); Risk Adjustment Webinar at 3 (July 1, 2014).[8]

---

[8]    These    trainings    are    available    at:
https://www.csscoperations.com/internet/csscw3_a.nsf/DID/8CW0U58EX8.

Complaint - *24*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

86.    Further, as MAOs do not directly provide medical care to Part C beneficiaries directly, CMS trained them to "take steps to ensure that they have, or have access to, the proper medical documentation to support diagnoses being submitted for risk adjustment." *See, e.g.*, 2005 Risk Adjustment Data Basic Training for MAOs § 8.7.3. More specifically, CMS explained that MAOs "are responsible for the accuracy of the data they submit to CMS" and "[w]here necessary, they should obtain the proper documentation to support diagnoses and maintain an efficient system for tracking diagnoses back to medical records." *Id.* CMS reiterated those instructions to MAOs regarding their responsibility for ensuring proper medical record documentation during trainings conducted in 2005, 2006, 2007, 2008, and 2012. In addition, CMS provided training for MAOs on combatting Medicare fraud stating that "encourag[ing] or support[ing] inappropriate risk adjustment submissions" are "Key Indicators" of Medicare fraud, waste, and abuse. *See* Combating Medicare Parts C and D Fraud, Waste, and Abuse Web-Based Training Course at 47 (Jan. 2019) (available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/CombMedCandDFWAdownload.pdf).

**E.    CMS Required MAOs to Delete Diagnosis Codes That Were Not Supported by Medical Record Documentation**

87.    CMS recognized that MAOs may subsequently obtain information showing that diagnosis codes that the MAOs previously submitted were not valid for risk adjustment purposes, such as because such codes are not supported by medical record documentation. The duties imposed by the risk adjustment regulations, including the duty to exercise due diligence and good faith in ensuring data accuracy, 42 C.F.R. § 422.504(l), and the duty to detect and correct non-compliance with CMS's program requirements, *id.* § 422.503(b)(4)(vi), required MAOs to delete unsupported diagnosis codes.

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

88.     CMS also recognized that, unless such codes were deleted or withdrawn, the inclusion of the inaccurate diagnosis codes would cause CMS to calculate – and make – higher risk adjustment payments to MAOs that it would not have made but for the submission of the inaccurate data. This, in turn, would result in the MAOs violating their regulatory and contractual obligations, as well as attestations, to ensure the accuracy of their risk adjustment data submissions. *See* infra ¶¶ 76-80. Accordingly, CMS implemented a function in each of the risk adjustment data reporting systems – RAPS and EDPS – for MAOs to use to delete inaccurate diagnosis codes.

89.     In addition to implementing the delete functions in RAPS and EDPS to enable MAOs to fulfill their regulatory obligation and attestations, CMS also provided instructions and training to MAOs on their responsibility to use this function to delete inaccurate diagnosis codes that they had submitted for risk adjustment purposes. For example, CMS instructed MAOs that if "upon conducting an internal review of submitted diagnosis codes," they "determine[] that any ICD[] diagnosis codes that have been submitted do not meet risk adjustment submission requirements," they are "responsible for deleting the submitted ICD[] diagnosis codes as soon as possible." MMC Manual, Chap. 7 § 40 (June 2013).

90.     CMS also repeatedly emphasized the obligation to delete inaccurate diagnosis codes that had been submitted during trainings for MAOs. For example, in 2003, CMS provided training to MAOs that if they "identif[y] incorrect or invalid information that has been submitted, [they] must delete that information." 2003 Regional Risk Adjustment Training for Medicare+Choice Organization Questions and Answers at 11. Likewise, in 2005, CMS trained MAOs on their "responsibilities regarding deletions." 2005 Risk Adjustment Data Basic Training for MAOs Participant Guide § 4.16. Specifically, CMS explained that MAOs "must submit

Complaint - 26

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

delete records when an erroneous diagnosis cluster has been accepted by RAPS" and the "reasons to delete" include where any of the "data fields" in a diagnosis code cluster submitted to RAPS are "incorrect." *See id.* at §§ 4.12 to 4.16. To ensure that MAOs understood their responsibilities for making deletions, CMS provided similar trainings for MAOs in 2006, 2007, 2008, and again in 2014. *See* 2006 Risk Adjustment Data Basic Training for MAOs Participant Guide §§ 4.12 to 4.16; 2007 Risk Adjustment Data Training Participant Guide §§ 4.12 to 4.16; 2008 Risk Adjustment Technical Assistance Participant Guide §§ 4.12 to 4.16; CMS June 2014 Risk Adjustment Webinar.[9]

91. More specifically, and as CMS explained to MAOs like Cambia, it is important for the MAOs to timely report deletions of inaccurate diagnosis codes because deletions can directly affect the accuracy of CMS's final reconciliation calculation for each payment year. As noted above, *see supra* ¶ 44, as part of its reconciliation process, CMS may make an additional payment to a MAO based on additional diagnosis codes reported before the final submission deadline or seek a recoupment if the MAO deleted inaccurate diagnosis codes.

92. Finally, to ensure that MAOs can fulfill their obligation to delete inaccurate diagnosis code submissions, CMS also promulgated regulations and configured its risk adjustment data reporting systems to allow MAOs to submit deletions both before and after the final deadline for RAPS and EDPS data submissions. *See* 42 C.F.R. § 422.310(g)(2)(ii). In other words, while MAOs ordinarily were required to make final risk adjustment diagnosis data submissions by a specific deadline prior to receiving their final reconciliation payments for a given payment year, CMS required MAOs to delete inaccurate diagnosis codes that had been previously submitted even *after* that deadline. This, in turn, enabled CMS to recover risk

---

[9] These trainings are available at: https://www.csscoperations.com/internet/csscw3_a.nsf/DID/8CW0U58EX8.

Complaint - 27

adjustment payments associated with the deleted diagnoses as part of CMS's risk score rerun processes. In the Medicare Part C context, diagnosis deletions reported before the deadline are known among the MAOs as "open-period deletes," while diagnosis deletions reported after the deadline are known as "closed-period deletes."

### TO ACCURATELY CALCULATE PART C RISK ADJUSTMENT PAYMENTS, CMS IMPOSED REGULATORY AND CONTRACTUAL OBLIGATIONS ON PART C MAOs – INCLUDING CAMBIA – TO ENSURE THE ACCURACY OF THEIR DIAGNOSIS CODES AND TO DELETE INACCURATE CODES

93.     CMS promulgated regulations and annual agreements to define the obligations of MAOs under Medicare Part C. As set forth below, among the most important regulatory and contractual obligations of the MAOs are those pertaining to their responsibilities for ensuring the accuracy of the risk adjustment diagnosis data that they submit to CMS and for deleting inaccurate data that they previously submitted.

**A.     CMS Regulations Required MAOs Like Cambia to Implement Compliance Procedures to Ensure the Accuracy of Their Risk Adjustment Diagnosis Data Submissions**

94.     Throughout the relevant period, CMS required MAOs to implement effective compliance programs and defined this requirement as a prerequisite to MAOs obtaining and retaining payments under Part C. *See* 42 U.S.C. § 422.503(a). As CMS explained as early as June 2000, one purpose of requiring MAOs to implement compliance programs is to ensure that the information they submit to CMS is accurate and truthful. *See* 65 Fed. Reg. 40170-01 at 40264 (June 29, 2000).

95.     At the outset, CMS's Part C regulations require MAOs – including Cambia – to "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse." 42 C.F.R. § 422.503(b)(4)(vi).

Complaint - *28*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

96.     CMS's Part C regulations specify that the compliance program that MAOs like Cambia are required to implement "must, at a minimum, include [certain] core requirements," which include, as relevant here:

- To establish and implement "an effective system for routine monitoring and identification of compliance risks," which "should include internal monitoring and audits and, as appropriate, external audits," to evaluate the MAO's "compliance with CMS requirements and the overall effectiveness of the compliance program."
- To establish and implement "procedures and a system for promptly responding to compliance issues as they are raised, investigating potential compliance problems as identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly to reduce the potential for recurrence, and ensuring ongoing compliance with CMS requirements."

*Id.* § 422.503(b)(4)(vi)(F)-(G).

97.     In the event that an MAO like Cambia uncovers "evidence of misconduct related to payment," CMS's Part C regulations require the MAO to "conduct a timely, reasonable inquiry into that conduct" and to undertake "appropriate corrective action[]," including "repayment of overpayments" in response. *Id.* § 422.503(b)(4)(vi)(G).  CMS's Part C regulations also required Cambia and other MAOs to "have procedures to voluntarily self-report potential fraud or misconduct related to [the Part C] program to CMS or its designee." *Id.*

**B.     Cambia and Other MAOs Assumed the Obligation to Ensure the Accuracy of Their Risk Adjustment Data Submissions and to Delete Inaccurate Data by Executing Part C Annual Agreements with CMS**

98.     In addition to being subject to regulatory requirements, MAOs like Cambia also agreed in their Part C annual agreements to be responsible to CMS for ensuring the accuracy of their risk adjustment diagnosis data submissions.

Complaint - *29*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

99.    As relevant here, each time Cambia executed a Part C annual agreement, it affirmatively accepted the obligation to ensure that the risk adjustment data it submits to CMS for Part C purposes are accurate, complete, and truthful. *See* Form of CMS Coordinated Care Plan Agreement, Art. IV.C.2 (available at sec.gov/Archives/edgar/data/49071/000119312505218181/dex101.htm) (Form of CMS MAO contract disclosed by Humana) ("Humana Part C Agreement"); Compl. Exs. 2 and 3 at Art. IV D.2, *United States v. Anthem*, Case 1:20-cv-02593 (S.D.N.Y. Mar. 26, 2020), ECF Nos. 1-2 & 1-3 (Anthem MAO contracts) ("Anthem Part C Agreements" and, with Humana Part C Agreement, the "Part C Annual Agreements"). Relatedly, and in accordance with CMS regulations, *see* 42 C.F.R. § 422.510, the Part C Annual Agreements also specified at Article VIII.B.1(a) that CMS could terminate Cambia's participation in Medicare Part C if CMS determined that Cambia had submitted false data or failed to provide CMS with valid risk adjustment data.

100.    By executing Part C Annual Agreements, Cambia and other MAOs also agreed to comply with CMS's requirements relating to the submission of diagnosis codes.[10] Specifically, Cambia agreed to operate its MA plans in compliance with the requirements of applicable Federal statutes, regulations, and policies and to implement a compliance plan in accordance with 42 C.F.R. § 422.503(b)(4)(vi). *See* Part C Annual Agreements, Art. II.A and Art. III.F. The Part C annual agreements further define the applicable federal policies. Part C Annual Agreements Art. II.A. On information and belief, Cambia's agreement specifically referenced compliance with the Medicare Managed Care Manual. *See* Anthem Part C Agreements at Art. II.A.

---

[10] In this regard, the Part C Annual Agreements further specified that"[a]s a condition for receiving a monthly payment under" the agreement, MAOs like Cambia would "request payment . . . on the forms attached" to the contract, including "Attachment B," which required the MAO to certify the "accuracy, completeness, and truthfulness" of the risk adjustment data submitted to CMS. See, Article IV.C.2 (Humana Part C Agreement); Art. IV.D.2 (Anthem Part C Agreements).

Complaint - *30*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

101. In other words, by executing its Part C annual agreements, Cambia affirmatively assumed the obligation not only to follow CMS regulations requiring compliance with the ICD coding guidelines, including the medical record documentation standard, but also to comply with the requirement that MAOs affirmatively assess the accuracy of their diagnosis data submissions against the ICD coding guidelines and the medical record documentation standard.

102. During the relevant period, Cambia was well aware of its contractual obligation to submit diagnosis data in accordance with CMS's requirements. For example, as a condition of receiving a Medicare Advantage payment, Cambia officials were required to "attest[] to . . . the accuracy, completeness, and truthfulness or relevant data that CMS requests." *See* Medicare Manage Care Manual, Chap. 11, Section 130.

103. Cambia also understood that relevant sections of the MMC Manual and CMS's trainings reflected the controlling requirement for risk adjustment diagnosis coding.

104. More specifically, Cambia knew that the ICD coding guidelines required particular types of evidence in the medical records to support specific medical conditions like diabetes with complications or active forms of cancer.

105. In addition, by executing the Part C annual agreements, Cambia agreed to abide by CMS's requirement for MAOs to delete inaccurate diagnosis codes that they previously submitted. *See* Part C Annual Agreements, Art. II.A. As discussed above, *see supra* ¶¶ 98-102, CMS issued public guidance to Cambia and other MAOs that, as part of their regulatory obligation to ensure the accuracy of risk adjustment data, they were "responsible for deleting the submitted ICD[] codes as soon as possible" whenever they "determine[] that any IC[] diagnosis codes that have been submitted do not meet risk adjustment submission requirements." *See* MMC Manual, Chap. 7 § 40 (June 2013).

Complaint - *31*

106.    Cambia, in turn, understood both how to use the delete function in the RAPS and EDPS reporting systems and when it was appropriate for Cambia to delete diagnosis codes.

107.    In the first regard, Cambia implemented procedures that allowed it to delete previously-submitted RAPS and EDPS diagnosis data submissions and to track the status of such deletion efforts. For example, Cambia did delete orphan claim diagnosis codes related to approximately $4 million of Medicare payments for the 2018 service year, but has ignored the deletion of additional unsupported diagnosis codes of approximately $17 million.

108.    Based on CMS training as well as its own experience as a major health insurance company, Cambia was well aware of several circumstances that could lead to the presence, in the claims that Cambia received from providers, of inaccurate diagnosis codes that were unsubstantiated by medical record documentation.

109.    Cambia knew its provider network relied on the HCC suspecting information presented on the CGMA web portal and knew, or should have known, that presenting unlikely suspecting would taint the diagnostic submission results of their QIP program to close member HCCs.

110.    In addition, Cambia also had a so-called Quality Incentive Program "QIP" by which Cambia provided incentives for healthcare providers to review all suspected HCCs presented on the CGMA web portal and either "close" the suspected open HCC by submitting a claim or by uploading a medical record demonstrating a related diagnosis for that member.

111.    Cambia understood that its QIP program created a strong financial incentive for providers to review suspected HCCs and submit additional related diagnosis codes both in terms of the number and the severity of reported medical conditions for Part C beneficiaries.

Complaint - 32

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

112.    Cambia did permit providers to invalidate HCCs on the portal. However, when the process by which Cambia would present suspected diagnoses to providers changed in 2019, its failure to inform providers of the change created a substantial and unreasonable risk of adoption of unlikely conditions by those providers. Cambia was aware that many of its providers so relied on the suspecting presented that they invalidated a very low percentage, if any, HCCs.

113.    Accordingly, Cambia's provision of monetary incentives to providers in order to validate highly unlikely HCCs constituted knowing payment of remuneration to induce providers to provide diagnoses that would be paid for by Medicare, in violation of the Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS").

114.    The AKS arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupts medical decision-making and could result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population.  To protect the integrity of the federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form.  The AKS was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs."  H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

115.    In 1977, Congress amended the AKS to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail.  See Social Security Amendment of 1972, Pub. L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b.  In doing so, Congress noted

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

that the purpose of the anti-kickback statute was to combat fraud and abuse in medical settings which "cheats taxpayers who must ultimately bear the financial burden of misuse of funds . . . diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." H.R. Rep. No. 95-393, pt. 2, at 37, reprinted in 1977 U.S.C.C.A.N. 3039, 3047. .

116. In 1987, Congress again strengthened the AKS to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

117. The AKS prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

118. The statute provides, in pertinent part:

(b) Illegal remunerations
* * *
(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
(A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
(B) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

119. In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320a-7a(a).

120. Compliance with the AKS is a precondition to participation as a health care provider under Medicare.

C. **Pursuant to Their EDI Agreements with CMS, MAOs Like Cambia Agreed to Comply with the Obligation to "Research and Correct" Risk Adjustment Data Discrepancies**

121. As a condition for using the RAPS and EDPS systems to submit risk adjustment diagnosis data to CMS for risk adjustment payments, MAOs must execute Electronic Data Interchange ("EDI") agreements with CMS.

122. In these agreements, Cambia and other MAOs expressly agree to assume a number of specific obligations relating to their risk adjustment data submissions. Each entity executing an EDI agreement agreed that it will be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents. *See* Compl. Exs. 6, 7 and 8 at A.1, *United States v. Anthem*, Case 1:20-cv-02593 (S.D.N.Y. Mar. 26, 2020), ECF Nos. 1-6, 1-7, and 1-8 (EDI enrollment form and agreements); Sample EDI Enrollment (Agreement) Form & Instructions at A.1, available at cgsmedicare.com/pdf/J15_EDI_EnrollAgreement2015re.pdf;

Complaint - *35*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

Medicare Claims Processing Manual, Chap. 24 § 30.2.A.1. This includes the obligation to research and correct claim discrepancies. *See id.* § 30.2.A.14.

123. On information and belief, during the relevant period, executives at Cambia executed and were operating under EDI agreements in which Cambia expressly agreed to research and correct claim discrepancies.

**D.    MAOs Like Cambia Submitted Annual Attestations to CMS to Certify That Their Risk Adjustment Diagnosis Data Submissions Were "Accurate" to Their "Best Knowledge, Information, and Belief"**

124. Medicare Part C regulations require MAOs like Cambia to submit annual attestations to CMS for each of their Part C plans that, among other things, certify the accuracy of the risk adjustment diagnosis data they submitted for the relevant payment year. *See* 42 C.F.R. § 422.504(l). The Part C regulations further specify that the MAO's submission of their annual attestations is "a condition for receiving a monthly [capitated] payment" from CMS. *Id.*

125. In addition to being a regulatory requirement, the MAOs' obligation to submit annual attestations regarding the accuracy and truthfulness of their risk adjustment diagnosis data is also specified in the Part C annual agreements that they execute with CMS. *See* ¶ 98-102.

126. Cambia understood that its receipt of risk adjustment payments from CMS was conditioned on its submission of the annual attestations to CMS in compliance with the Part C regulations and the annual agreement provisions.

127. On information and belief, during the relevant period, senior Cambia executives signed and submitted annual attestations to CMS each year for the Part C plans operated by Cambia. Cambia was required to submit those annual attestations after the final submission deadline for reporting diagnosis data for each payment year. According to CMS guidance, risk adjustment certifications are to be signed by the Chief Executive Officer, Chief Financial Officer,

Complaint - *36*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

and/or Chief Operating Officer of the organization. *See* CMS Memo re Instructions for Requesting Electronic Signature Access in the Health Plan Management Systems (HPMS) (Apr. 10, 2019), available at cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/HPMS/Downloads/sysHPMS-Electronic-Sign-memo.pdf.

128.   In each of these annual attestations, the Cambia executives would have certified that Cambia understood that the risk adjustment information it submitted to CMS "directly affects the calculation of CMS payments to [Cambia]" and that "misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution." Having "acknowledge[d]" that understanding, the Cambia executives further certified that "all information submitted to CMS" by Cambia for risk adjustment payment purposes "is accurate, complete, and truthful" according to Cambia's "best knowledge, information, and belief." *See* CMS Memo re Payment Year 2019 Risk Adjustment Attestations (Jan. 31, 2020), available at https://www.cms.gov/httpseditcmsgovresearch-statistics-data-and-systemscomputer-data-and-systemshpmshpms-memos-archive/hpms-memo-6.

129.   This memorandum explained that all MAOs are required to submit risk adjustment data for the 2018 service year, accompanied by the following attestation:

> Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services (CMS) and (*name of Medicare Advantage Organization, MMP, or PACE Organization*), hereafter referred to as the MA Organization, governing the operation of the following Medicare Advantage and Medicare Advantage-Prescription Drug plans (*contract identification numbers*), the MA Organization hereby requests payment under the contract, and in doing so, makes the following attestation concerning CMS payments to the MA Organization. The MA Organization acknowledges that the information described below directly affects the calculation of CMS payments to the MA Organization or additional benefit obligations of the MA Organization and that misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

> The MA Organization has reported to CMS for the period of January 1, 2018, to December 31, 2018, all risk adjustment data (*inpatient hospital, outpatient hospital, and physician*) available to the MA Organization, Medicare Medicaid Plan or PACE Organization as of the applicable deadline(s), with respect to the above-stated MA and MA-PD plans. Based on best knowledge, information, and belief as of the date indicated below, all information submitted to CMS in this report is accurate, complete, and truthful.

*Id.* (emphasis in original).

130.    As CMS repeatedly notified MAOs since June 2000, the purpose of the annual attestation requirement is to place the responsibility on MAOs like Cambia to make "good faith efforts to certify the accuracy" of the risk adjustment data they submitted. *See* 65 Fed. Reg. 40,170, 40,268 (June 29, 2000); *see* also MMC Manual Chap. 7, § 111.7 (Aug. 2004) ("CMS expects [MAOs] to design and implement effective systems to monitor the accuracy, completeness, and truthfulness of risk adjustment data and to exercise due diligence in reviewing the information provided to CMS.").

131.    Cambia, in turn, understood its obligation to make "good faith efforts" and "exercise due diligence" to ensure the accuracy of its risk adjustment diagnosis data submissions to CMS.

### THE GOVERNMENT'S EXTENSIVE EFFORTS TO ENSURE THE INTEGRITY AND ACCURACY OF MEDICARE PART C RISK ADJUSTMENT PAYMENTS

**A.    CMS Sample Audits of Risk Adjustment Data Submissions**

132.    Since the early 2000s, CMS has conducted audits of diagnosis codes submitted by MAOs, known as Risk Adjustment Data Validation ("RADV") audits.

133.    In 2001, CMS alerted MAOs that they were "required to submit medical records for validating encounter data" and that medical record reviews may be audited to ensure the accuracy of diagnoses. *See* MMC Manual, Chap. 7, § 110.3 (October 2001). In 2004, CMS updated its public guidance to MAOs by explaining that "[a] sample of risk adjustment data used

Complaint - *38*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

for making payments may be validated against hospital inpatient, hospital outpatient, and physician medical records to ensure the accuracy of medical information. Risk adjustment data will be validated to the extent that the diagnostic information justifies appropriate payment under the risk adjustment model." *See* MMC Manual, Chap. 7, § 111.8 (Aug. 2004).

134. To facilitate its audit of risk adjustment diagnosis data, CMS promulgated a regulation to require MAOs as well as healthcare providers who render care to Part C beneficiaries to supply the underlying medical records to CMS for use in RADV audits of risk adjustment diagnosis code submissions. *See* 42 C.F.R. § 422.310(e).

135. For each audit, CMS selected a sample of enrollees in an MAO's Part C plans and reviewed the medical records for those enrollees to determine if the diagnosis codes submitted by the MAOs were supported by those records.

136. For the payment year 2007 audits, CMS calculated the amounts by which the Part C MA plans were overpaid as result of the inaccuracies and sought refunds from the plans. *See, e.g.,* Medicare Advantage RADV Audits Fact Sheet at 1 ("CMS recouped $13.7 million in overpayments associated with sampled beneficiaries" as result of its RADV audits of Part C MA plans for payment year 2007).[11]

137. In addition to allowing CMS to recoup overpayments, the RADV audits also highlighted for Cambia and other MAOs that a material percentage of the diagnosis codes they submitted to CMS were inaccurate.

---

[11] This fact sheet is available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Fact-Sheet-2013.pdf (last visited Sept. 22, 2020).

As noted above, CMS selected a sample of diagnosis codes for each RADV audit. RADV audits did not, and are not intended to, review all or significant percentage of the diagnosis codes submitted by MAOs to CMS.

Complaint - *39*

**B.    The Government Has Actively Enforced the Requirement for Accurate Risk Adjustment Diagnosis Data Submissions**

138.    Further, because the accuracy of risk adjustment diagnosis data submissions directly impacts the integrity of the risk adjustment payment system, the Government has sought to enforce the requirement for data accuracy by actively pursuing legal remedies against both MAOs that have knowingly submitted inaccurate and untruthful diagnosis data to CMS and healthcare providers that knowingly caused MAOs to submit inaccurate and untruthful diagnosis data to CMS.

139.    In August 2012, for example, the Government obtained $3.82 million in settlement from SCAN Health Plan, a Long Beach, California-based managed care company, based on allegations that SCAN had used outside vendors to review medical charts of SCAN's Part C beneficiaries to identify new diagnosis codes for SCAN to submit to CMS, but had failed to disclose to CMS that chart review results also indicated that some of the previously-submitted diagnosis codes might need to be deleted, which enabled SCAN to improperly obtain higher risk adjustment payments from CMS.

140.    Further, in May 2017, the Government obtained a $32.5 million settlement from Freedom Health, Inc., a Tampa-based MAO, in connection with a *qui tam* action involving allegations that Freedom Health had submitted unsupported diagnosis codes to CMS on behalf of two Part C plans and thereby obtained inflated risk adjustment payments. In addition to paying the Government to settle these allegations, Freedom Health also agreed to be subject to a Corporate Integrity Agreement that included procedures for "determin[ing] whether Freedom properly submitted risk adjustment eligible diagnoses to CMS in accordance with CMS's rules and criteria under the Medicare Advantage Program." *See* Corporate Integrity Agreement, App. C

Complaint - *40*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

at     1     (available     at     https://oig.hhs.gov/compliance/corporate-integrity-agreements/cia-documents.asp).

141.    In addition, in October 2018, the Government obtained a $270 million settlement from DaVita Medical Holdings LLC, a healthcare provider. This settlement was based in part on allegations that DaVita had given improper coding guidance to its employees so that they would record inaccurate diagnosis codes to MAOs in order to boost its payments under revenue-sharing or capitated arrangements with MAOs and that DaVita had hired coding companies to perform retrospective chart reviews to identify new diagnosis codes to report to MAOs for submission to CMS, but did not take corrective action with respect to previously submitted codes that could not be substantiated by chart review. More specifically, DaVita's alleged misconduct caused CMS to overpay the MAOs based on inaccurate diagnosis codes from DaVita and, in turn, enabled DaVita to receive higher cost-sharing payments from the MAOs.

142.    Likewise, in August 2019, the Government obtained a settlement against Beaver Medical Group, L.P., a California-based physician group, based on allegations that, to increase its payments from MAOs pursuant to revenue-sharing arrangements, Beaver had knowingly submitted diagnoses that were not supported by the medical records, and thereby caused CMS to calculate risk adjustment payments based on inaccurate diagnosis data.

143.    More recently, the Government has sued Anthem, an operator of MAOs, under the False Claims Act, for failure to delete improper diagnostic codes as part of the risk adjustment process. *See* Compl., *United States v. Anthem*, Case 1:20-cv-02593 (S.D.N.Y. Mar. 26, 2020), ECF No. 1.

## CAMBIA USED ITS CHART REVIEW PROGRAM TO OBTAIN HIGHER PAYMENTS FROM CMS

### A.    Cambia's Procedures for Submitting to CMS the Diagnosis Codes That It Collected from Providers' Claims

Complaint - *41*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

144.    Cambia relied on the diagnosis codes contained in the insurance claims submitted by healthcare providers who treated Cambia's Part C beneficiaries as the primary source of the diagnosis data it submitted to CMS for risk adjustment purposes.

145.    Cambia also obtained supplemental data files from its providers with additional diagnoses. Further, Cambia obtained and coded medical records for its members.

138.    Cambia submitted claim data and non-claim data files to their submission vendor, Cotiviti, which then submitted files to CMS for acceptance of added and deleted diagnoses.

146.    Before the 2018 date of service years, orphan claim deletes were identified and processed internally by Cambia employees.  For the 2018 date of service year, Cambia paid its chart retrieval vendor, Advantmed to prepare orphan claim delete files for review and submission by Cambia staff.

147.    Cambia submitted orphan claim deletions amounting to approximately 75% of the additional diagnoses revenue generated by their retrospective chart chase campaigns for service years 2015 and 2016.  As noted above, for service year 2018, Cambia has only submitted deletes with the approximate value of 15% ($4 million compared to $28 million) resulting from their claim review process carried out by Cambia's vendor, Advantmed.  Cambia is aware that the vendor did not accurately create orphan claim delete files and is aware that they are substantially deviating from their prior approach to submitting complete orphan claim deletes for the 2018 service year and thereby improperly retaining millions of dollars in Medicare overpayments.

B.    **To Encourage Providers to Supply Records for Chart Review, Cambia Instituted Chart Reviews and the QIP Program**

148.    Cambia used suspected claims information from their vendor, Pulse8, to identify which member charts to pursue in their retrospective chart chase campaigns. Where members had

Complaint - *42*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

an open, suspected HCC, the charts for those members would be obtained either by direct review of a provider's Electronic Medical Record (EMR) system, if Cambia had access, or by obtaining a copy of the chart from the provider. Those charts would then be coded by the chart recovery vendor, Advantmed personnel, or internal Cambia coders. Those coded files would then be submitted to CMS for acceptance of the codes for risk adjustability.

149.    To induce healthcare providers to review the suspected diagnoses, Cambia instituted a program to provide compensation to providers for their efforts.

C.    **Beginning with the 2018 Service Year, during the 2019 Retrospective Chart Chase Campaign, Cambia Failed to Submit Deletions for Unsupported Orphan Claim Codes Resulting in Increased Payments from Medicare**

150.    Contrary to Cambia's two-way review claim delete policies for its retrospective chase campaigns in 2016 and 2017, during the retrospective campaign for 2019, Cambia chose not to delete all unsupported claim diagnoses.

151.    Based on initial information received from Advantmed, which was only based on a partial review of medical records, and which presented a very low deletion rate of only 15% ($4 million), Cambia knew, or should have known, that the "orphan claim deletes" for the 2018 service year had not been processed properly.

152.    In fact, Advantmed transmitted an additional "orphan claim delete" file valued at approximately 27% ($7.5 million) upon completion of its review. This amount was still much lower than Cambia knew or should have known to be accurate.

153.    Nevertheless, Cambia only reported the first, lowest, and clearly incomplete delete information to Medicare, thereby reducing the risk adjustment payment received by Cambia by only 15% ($4 million) for deletes.

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

154.    Once Cambia undertook its own analysis of the Advantmed delete files in late 2019 and early 2020, it became apparent that Advantmed had not followed any reasonable protocol to identify "orphan claim deletes," and as a result had significantly understated the amount of "orphan claim deletes."

155.    In early 2020, the Cambia Risk Adjustment team reviewed an analyst's summary of the delete files provided by Advantmed and became aware of a significant underreporting to Medicare of the "orphan claim deletes," of approximately $17 million, based on prior deletes of approximately 75% of the value of the retrospective campaigns for service years 2015 and 2016.

156.    Rather than immediately report this information to its internal Medicare Compliance department, consistent with its own policies, or to Medicare, Cambia executives and personnel engaged in a series of meetings to decide what to do.   Several of these meetings occurred in February and March 2020, and generally included Janette Gacaferi (Cambia Assistant Director Risk Adjustment and supervisor of the risk adjustment team) and members of her risk adjustment team.   The group thoroughly reviewed the information and understood that Medicare had overpaid Cambia at least $8 million based on unsupported HCC codes, and likely much more.

157.    Rather than report this information (and provide repayment) to Medicare, Gacaferi reported back to the group that Cambia was simply going to do nothing in response to the fact that the information Cambia had provided and certified to Medicare in order to obtain additional funding was incomplete and inaccurate.

158.    The decision to not report the "orphan claim deletes" to Medicare appears to be driven in part by the incentive program instituted by Cambia for senior executives overseeing Risk Adjustment, who receive a substantial portion of their compensation based on Cambia's

Complaint - *44*

profitability. Simply put, Cambia's senior executives and management do not want to repay the money Cambia wrongly received.

159. Given that Cambia analysts were able to match up all the information quickly in early 2020, Relator believes that Cambia could have reported the "orphan claim deletes" to Medicare within a week. Consistent with Medicare regulations, Cambia's own policy manual, the Regence Medicare Risk and Revenue Policy and Procedure, acknowledges that Medicare overpayments must be repaid within 60 days. Instead, in order to retain the additional Medicare risk adjustment payment that was wrongly received, Cambia has determined to do nothing, despite its established regulatory obligation to repay Medicare.

160. At this point, the process by which Cambia will review claims and provide risk adjustment information for the 2019 service year has not been determined. Given the lucrative (though improper) process used for the 2018 service year, Cambia may continue to misreport risk adjustment codes to Medicare in the future and fail to delete timely other codes when it becomes aware of the need to submit such deletes.

161. Cambia's knowing failure to report "orphan claim deletes" to Medicare is not the only way that Cambia has fraudulently reported risk adjustment information to Medicare for additional payment. As discussed above, Cambia manipulated QIP data and ignored inconsistent diagnoses in order to receive more funds from Medicare.

162. As Cambia knew, encouraging providers to accept inaccurate and unlikely diagnosis codes could (and did) lead CMS to calculate higher net risk adjustment payments to Cambia. Through its scheme to encourage providers to accept those codes, Cambia intended to allow, and did allow, inaccuracies to remain in its diagnosis code submissions. This practice

Complaint - 45

inevitably led to inflated risk adjustment payments for Cambia because caused CMS was making its calculations based on inaccurate diagnosis data.

### CAMBIA KNOWINGLY DISREGARDED ITS OBLIGATION TO DELETE INACCURATE DIAGNOSIS CODES BECAUSE IT PRIORITIZED PROFITABILITY OVER COMPLIANCE

163.   Cambia has repeatedly acknowledged its compliance obligations, as discussed, *supra* ¶¶ 93-131.

164.   Cambia personnel were trained with respect to their Medicare compliance obligations and were aware of the regulatory obligations regarding deleting diagnoses which could result in improper risk adjustment overpayments.

165.   Cambia's failure to comply with its contractual and regulatory obligations was not due to ignorance or mistake. Cambia understood the structure of the risk adjustment payment system and its responsibilities as an MAO, including, specifically, (a) the direct impact that diagnosis data has on CMS's risk adjustment payment calculations, (b) Cambia's obligation to ensure the accuracy of its diagnosis data submissions to CMS, (c) the presence of substantial numbers of inaccuracies in the diagnosis codes that Cambia was submitting to CMS, (d) Cambia's obligation to research and correct data discrepancies, and (e) Cambia's duty to delete previously-submitted diagnosis codes that proved to be inaccurate.

166.   Cambia knew it was not submitting orphan claim deletes consistent with its compliant approach in prior years, knew it was providing inaccurate suspecting information to its providers resulting in inaccurate diagnosis of member conditions, and knew it was not resolving conflicting information involving provider HCC invalidation information and related claim diagnoses, all resulting in millions of dollars of improper overpayments.

Complaint - *46*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

**CAMBIA's Knowing Decision to Disregard Its Regulatory and Contractual Obligations Resulted in the Submissions of Thousands of False Claims and Avoidance of Its Obligation to Repay the Government**

167. As set forth above, Cambia understood its obligation to submit accurate diagnosis data to CMS and to delete inaccurate diagnosis code submissions that could not be validated by the medical records. Cambia also was aware of significant rates of errors in the diagnosis codes it was submitting to CMS based on the provider claims. Further, Cambia knew that, while the chart review results from Advantmed did not properly identify "orphan claim deletes," Cambia could (and did) readily identify the error in Advantmed's analysis and the related "orphan claim deletes" that Cambia was required to report to Medicare. Cambia understood that it both had the ability and the obligation to review the information provided by Advantmed against the diagnosis codes that Cambia previously submitted to find and delete the codes that could not be validated based on the medical records. Cambia also knew that the amount of "orphan claim deletes" it chose to support were not even the total deletes proposed by Advantmed. Instead, Cambia reported interim information as if it were final.

168. In thousands of instances, Cambia's misconduct had a direct and foreseeable impact on CMS. Specifically, Cambia's misconduct not only enabled it to obtain and retain higher risk adjustment payments from CMS, it also adversely affected the integrity and accuracy of CMS's risk adjustment payment system. In addition, by knowingly failing to delete these and thousands of other inaccurate diagnoses, Cambia knowingly and improperly avoided its obligation to repay CMS for payments it received for these inaccurate diagnoses.

169. For each payment year in the relevant period – 2017 to present, Cambia submitted Part C annual attestations for its MA plans, which certified to CMS that all of the risk adjustment

Complaint - *47*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

diagnosis data Cambia had submitted for those MA plans were "accurate" based on Cambia's "best knowledge, information, and belief."

170. As Cambia knew, each of those Part C attestations was false. Specifically, Cambia had information in its possession that Cambia could have used to uncover numerous inaccuracies.

171. Cambia also knew that its ongoing submission of the false annual attestations to CMS had a direct and foreseeable impact on CMS. Specifically, as Cambia knew that CMS required MAOs like Cambia to submit Part C annual attestations before CMS would proceed with the final reconciliation phase of the risk adjustment payment process. *See supra* ¶ 96. Thus, the false attestations submitted by Cambia caused CMS to move forward with final reconciliation for Cambia's Part C plans and disburse reconciliation payments to Cambia during the relevant period.

## FIRST CLAIM

### Presentation of False or Fraudulent Claims in Violation of the False Claims Act and in Connection with Violation of Anti-Kickback Laws
### 31 U.S.C. § 3729(a)(1)(A)

172. Relator incorporates by reference paragraphs 1 through 171 above as if fully set forth in this paragraph.

173. On behalf of the Government, Relator seeks relief against defendant Cambia under 31 U.S.C. § 3729(a)(1)(a) because Cambia knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to CMS.

174. Specifically, on account of its choice to not disclose accurate information pertaining to its chart review program regarding "orphan claim deletes" and manipulation of suspecting information sent to providers to incentivize them to submit inaccurate diagnoses, as well as failure to investigate patent inconsistencies between invalidated HCCs and claim diagnoses, in connection with seeking final reconciliation payments from Medicare, in deliberate

Complaint - 48

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

ignorance or reckless disregard of its regulatory and contractual obligation to delete inaccurate diagnosis codes, Cambia knowingly submitted false Part C annual attestations to Medicare.

175.    By reason of the false annual attestations with respect to its claim and non-claim diagnoses that Cambia knowingly presented, or caused to be presented, for payment or approval, the Government has been damaged in a substantial amount to be determined at trial, and the Government, acting through Relator, is entitled to recover treble damages plus a civil monetary penalty for each false claim.

176.    Further, by providing remuneration and incentives to medical providers, Cambia induced those providers to confirm diagnoses even though Cambia knew it was unlikely that its insureds suffered from the diagnoses, in violation of the AKS.

## SECOND CLAIM

### Making and Using False or Fraudulent Statements, Records, Certifications and Claims in Violation of the False Claims Act and in Connection with Violation of Anti-Kickback Laws
### 31 U.S.C. § 3729(a)(1)(B)

177.    Relator incorporates by reference paragraphs 1 through 176 above as if fully set forth in this paragraph.

178.    On behalf of the Government, Relator seeks relief against Cambia under 31 U.S.C. § 3729(a)(1)(B) because Cambia knowingly made, used, or caused to be made or used, a false record or statement material to false or fraudulent claims.

179.    Specifically, on account of its choice to operate its chart review program in deliberate ignorance or reckless disregard of its regulatory and contractual obligation to review and delete inaccurate diagnosis codes and its deliberate actions in encouraging medical providers to verify highly unlikely HCCs, Cambia knowingly made, used, or caused to be made or used, false records, statements, and Part C annual attestations in relation to seeking final reconciliation payments from Medicare.

Complaint - 49

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

180. Further, by providing compensation to medical providers to confirm additional unlikely diagnoses in order to receive additional payments from Medicare, Cambia has knowing violated the AKS in connection with its making of false or fraudulent records, certifications, and claims.

181. By reason of these false records or statements, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover, through Relator's action, treble damages plus a civil monetary penalty for each false record or statement.

## THIRD CLAIM

### Reverse False Claims — Knowingly and Improperly Avoiding an Obligation to Repay the Government
### 31 U.S.C. § 3729(a)(1)(G)

182. Relator incorporates by reference paragraphs 1 through 181 above as if fully set forth in this paragraph.

183. Relator, on behalf of the Government, seeks relief against Cambia under 31 U.S.C. § 3729(a)(1)(G), both because Cambia knowingly made or used false records and/or statements material to an obligation to repay the Government and because Cambia knowingly concealed or knowingly and improperly avoided an obligation to repay the Government.

184. Specifically, on account of its choice to operate its chart review program in deliberate ignorance or reckless disregard of its regulatory and contractual obligation to research and delete inaccurate diagnosis codes, as well as its deliberate encouragement of medical providers to submit inaccurate diagnosis codes, including through payment of illegal kickbacks, Cambia knowingly made, used, or caused to be made or used, false Part C annual attestations that enabled it to evade its obligation to refund CMS under the Medicare Part C's final reconciliation process.

Complaint - *50*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

185.    Further, by deliberately or recklessly disregarding its regulatory and contractual obligation to delete inaccurate diagnosis codes, Cambia knowingly concealed its obligation to refund CMS for payments improperly received.

186.    By reason of these false records or statements, as well as Cambia's knowing concealment and avoidance, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## PRAYERS FOR RELIEF

187.    WHEREFORE, Relator, on behalf of the United States and on their own behalf, requests that this Court enter an order:

a.      That Defendants violated the False Claims Act;

b.      That Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty against Defendants of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act;

c.      That Defendants cease and desist from violating the False Claims Act;

d.      That Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to the False Claims Act;

e.      That Relator be awarded the maximum amount allowed as a relator share pursuant to 31 U.S.C. § 3730(d); and

f.      That the United States and Relator be granted all such other relief as the Court deems just and proper.

PLAINTIFF/RELATOR    DEMANDS    A    TRIAL    BY    JURY    ON    ALL    COUNTS.

Complaint - 51

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883

Dated: September 25, 9/25/2020 10:53:46 AM.

Respectfully submitted,

By: /s/ _____

Floyd G. Short
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Tel.: (206) 516-3880
Fax: (206) 516-3883
fshort@susmangodfrey.com

Silvija A. Strikis (*Pro Hac Vice* to be filed)
Joseph S. Hall (*Pro Hac Vice* to be filed)
**KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)

Counsel for Relator J. Doe

Complaint - *52*

SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (206) 516-3880; Fax: (206) 516-3883